UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| GARY WILSON, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 3:16-cv-00039-TWP-MPB<br>) |
| CITY OF EVANSVILLE, OFFICER JONATHAN OAKLEY, in his individual and official capacities, and OFFICER BRYAN UNDERWOOD, in his individual and official capacities, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants City of Evansville ("the City"), Officer Jonathan Oakley ("Oakley"), and Officer Bryan Underwood ("Underwood") (collectively, "Defendants") (Filing No. 34). Following his arrest for maintaining a common nuisance and possession of a precursor by a methamphetamine offender, Plaintiff Gary Wilson ("Wilson") filed this action asserting a violation of his Fourth Amendment rights under 42 U.S.C. § 1983 due to excessive force, and state law claims of assault, battery, negligence, and intentional and negligent infliction of emotional distress. (Filing No. 1-3.) The Defendants filed a Motion for Summary Judgment asserting that Wilson resisted arrest and reasonable force was used to effect an arrest. For the reasons set forth below, the Defendants' Motion for Summary Judgment is **granted.**

## I. BACKGROUND

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the Court must draw all reasonable inferences in favor of Wilson as

the non-moving party, and it may not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

On the evening of April 18, 2014, Evansville Police Department ("EPD") officers David Brown ("Brown") and Jackie Lowe ("Lowe") were on patrol when they smelled the odor of an active methamphetamine lab at 5322 North Kerth, Evansville, Indiana. Brown and Lowe observed a person leave the residence and because Wilson was known to them, they identified him by name. Brown and Lowe sent out a communication that "they smelled what was a meth lab" and as they were investigating, "Gary Wilson took off out the back door." ([Filing No. 34-5 at 6.](#))

Underwood and Oakley were partners in the same EPD patrol vehicle that night, when they received the communication from Brown and Lowe regarding a potential active methamphetamine lab on North Kerth and a request for assistance to approach the house. ([Filing No. 34-4 at 5-6](#), [Filing No. 34-5 at 6](#).) Using Wilson's name, Oakley pulled up Wilson's picture on the EPD computer system in their vehicle. The computer also provided information in an alert that "Mr. Wilson was not police friendly, and was known to carry pepper spray and knives." ([Filing No. 34-5 at 7](#).) Underwood and Oakley proceeded down an alley in the neighborhood with their lights turned off and did not use sirens, so that Wilson would not know of their location. ([Filing No. 34-4 at 6](#).)

Wilson left his house on North Kerth sometime after 10:00 p.m. and started heading to a friend's house, just to take a walk. While out walking, he noticed the officers' patrol car, without its police lights or sirens on, pass by him on the street. ([Filing No. 34-3 at 17-18.](#)) Wilson saw the police at his house, and then he saw one policeman get out of his car and head in his direction. *Id.* at 20. Wilson had no interest in meeting with police officers, so he attempted to elude them by cutting through an alley. *Id.* at 18-20. At some point, during the encounter, he took a break by an

air conditioning unit in a neighbor's yard, near an alley, to catch his breath. *Id.* at 17. Wilson could not recall if he needed to catch his breath due to the walk or from a medical condition. *Id.* After sitting at the air conditioner for approximately five minutes, Wilson noticed a policeman coming from the alley and another coming from the street. *Id.* Wilson began to have a panic attack.[1] Wilson does not recall if he took off running when he saw the police. (Filing No. 34-3 at 18-19). However, Wilson admits that he saw a police officer from a distance and jogged away when he observed the police heading in his direction. (Filing No. 34-3 at 19, 21.) The officers allege that Wilson took off running through a fence in a neighborhood backyard as soon as he saw them. (Filing No. 35 at 3.) Underwood alleges that when he spotted Wilson, he told him to stop. However, Wilson never heard the police yell "stop" or "halt." (Filing No. 34-3. at 21.)

Once Underwood caught up with him, Wilson heard Underwood say "on your stomach, hands behind your back." (Filing No. 44-1 at 8). As a result, Wilson rolled over onto his stomach and put his hands behind his back. Oakley arrived within a few seconds of Underwood. Wilson immediately complied, and Underwood handcuffed his right hand behind his wrist and left the other hand free. *Id.* at 10. Underwood kneed Wilson in the back to get Wilson's right hand cuffed. Underwood also hit him in the face and head repeatedly while saying "quit resisting, quit resisting" and told Oakley to tase Wilson. *Id*. Oakley tased Wilson twice. *Id.* at 11.

In contrast, Underwood testified that Wilson did not comply with his commands to get on the ground and that when he attempted to handcuff Wilson he could only get one hand cuffed because Wilson was resisting. (Filing No. 35 at 5.) Underwood concedes that he struck Wilson twice in the head area, but he alleges he did so to get Wilson turned onto his stomach. *Id.* at 5. Sergeant Donald Thompson ("Thompson") arrived on the scene during the struggle, and

---

[1] Wilson's panic attacks are related to his fear of police officers based on prior arrests. (Filing No. 34-3 at 20-21.)

3

Thompson struck Wilson in the face with his hand in an attempt to gain compliance. *Id.* Without giving a warning, Oakley deployed his taser after Wilson's hand went underneath his body and was not visible to officers. ([Filing No. 34-4 at 6](#).) The taser did not appear to have any effect on Wilson who was wearing thick clothes. *Id.* Oakley testified that he deployed his taser once, but ran three to four cycles. *Id.* at 7. However, Wilson testified that Oakley deployed his taser twice, and he was hit at least twenty times. ([Filing No. 34-3 at 11](#).) Oakley also struck Wilson with his hand in the brachial plexus (neck area and known as a pressure point) after the unsuccessful taser deployments. *Id.* ([Filing No. 34-4 at 7](#).) After both of Wilson's hands were in handcuffs the force ended. ([Filing No. 34-3 at 13](#).)

Both Underwood and Oakley were wearing body cameras that were newly issued to the EPD. Underwood did not turn on his body camera during the incident because of the rapidness of the situation and he did not think about pushing the button. ([Filing No. 34-5 at 14](#).) Oakley did not turn on his body camera because he did not think to turn it on. ([Filing No. 34-4 at 9](#).)

Following the incident, Wilson was unable to stand and he sustained a small cut that was bleeding. ([Filing No. 34-3 at 13](#).) Officers called an ambulance which transported Wilson to Deaconess Hospital. *Id.* at 13. At the hospital, a drug test and an alcohol test were performed. The alcohol test came back .8 and Wilson tested positive for methamphetamine. *Id.* at 16. Wilson was treated at the hospital for his injuries and taken to jail early the next morning. *Id.* at 23. He incurred $10,512.94 in medical expenses as a result of the incident. ([Filing No. 44-4 at 1](#).) The billing summary breakdown indicates that the largest expense was for a computerized tomography (CT) scan performed. Wilson suffered two black eyes and the cut. He also alleges permanent injuries from the incident in that he suffers from blurred vision and his head shakes uncontrollably at times. ([Filing No. 34-3 at 17](#).) He has not seen a neurologist for the neurological damage. His

symptoms onset months after the incident and he now suffers post-traumatic stress from fear of the police. *Id.*

Wilson was charged in case number 82D02-1404-FD-535 with Maintaining a Common Nuisance, a Class D Felony, and Possession of a Precursor by a Methamphetamine Offender, a Class D Felony. The charges related to this incident were eventually dismissed in a plea agreement to charges in two other cases. ([Filing No. 34-6](#).)

On March 14, 2016, Wilson filed this action in the Vanderburgh County Superior Court against the City and officers Underwood and Oakley. ([Filing No. 1-3 at 1](#).) He brought claims of excessive force and failure to protect against Underwood and Oakley for violation of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983. He also brought state law claims for assault and battery against Underwood and Oakley and for negligence and intentional and negligent infliction of emotional distress against all Defendants. *Id.* Defendants removed the action to this Court on March 29, 2016. ([Filing No. 1](#).) On May 1, 2017, Defendants filed their Motion for Summary Judgment.

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and

draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III. **DISCUSSION**

Defendants request summary judgment on each of Wilson's claims on the bases that reasonable force was used against Wilson to effectuate an arrest, qualified immunity protects Underwood and Oakley, and the Indiana Tort Claims Act bars Wilson's state law claims. The Court will address each contention in turn.

A.  **Fourth Amendment Claims**

Wilson asserts excessive force claims and failure to intervene claims against Officers Underwood and Oakley for their individual roles in not preventing harm to him.

1.  **Excessive Force (Count I)**

In judging whether the government's use of force was reasonable, courts must balance the risks of bodily harm in apprehending a fleeing suspect that the government's actions poses in light of the threat to the public that the government is trying to eliminate. *Scott v. Harris*, 550 U.S. 372, 383 (2007). In considering this balance, the court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court views the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision hindsight." *Id*. The reasonableness of force used is a legal question. *Bell v. Irwin,* 321 F.3d 637, 641 (7th Cir. 2003). "But when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers." *Id.* at 640.

Wilson argues that Underwood's and Oakley's use of hits, strikes, kicks, and deployment of a taser twice constituted excessive force. ([Filing No. 45 at 11](#)). He is not pursuing an excessive force claim against Thompson.[2] Wilson also conceded that the initial knee placed on his back by Underwood is not part of his excessive force claim. *Id.* at 24. Defendants argue that they used reasonable force in order to effectuate Wilson's arrest as he was fleeing and resisting arrest. By his own admission, Wilson sought to elude the police by cutting through an alley, jogging away, and he was out of breath by the time he reached the air conditioning unit in a neighbor's backyard.

---

[2] Thompson struck Wilson in the face with his hand. For tactical reasons, Wilson is not pursuing an excessive force claim against Thompson. ([Filing No. 45 at 13](#).)

Although Wilson explains that he was out of breath due to either walking or a prior medical condition, the Court accepts these facts as true, while viewing the circumstances—*i.e.* Wilson cutting through an alley, jogging and being out of breath—from the perspective of a reasonable officer on the scene. Accepting Wilson's explanation as true, a reasonable officer could have concluded that Wilson was fleeing from the police.

Wilson has not disputed the officers' suspicions that methamphetamine activity was occurring at his residence. Although there is no allegation that Wilson was in fact carrying a weapon on him on the night in question, Wilson admits that he sometimes carried a pocketknife on him, a fact that was known by police *before* pursuing Wilson. ([Filing No. 34-3 at 21](#).) Accepting as true, the facts alleged by Wilson, officers could reasonably conclude, at the time, that he was engaged in methamphetamine activity, was attempting to flee, and posed a threat to the officers' safety based on the information Underwood and Oakley had received that Wilson was unfriendly to police and carried a pocketknife. The Seventh Circuit has held that only facts known to a reasonable arresting officer at the time of the alleged Fourth Amendment violation are relevant. *See Fitzgerald v. Santoro,* 707 F.3d 725, 733 (7th Cir. 2013). Under the totality of the circumstances, officers could reasonably conclude that force would be necessary to effectuate Wilson's arrest.

The Court will now turn to the degree of force that officers used. Wilson asserts two factual disputes here. First, he contends that he immediately complied with Underwood's commands to lay down on his stomach and put his hands behind his back. Next, Wilson testified that the he was beaten in the head enough times and tased long enough to "kill a person". ([Filing No. 44-1 at 8](#).) Wilson does not dispute that throughout the encounter, one of his hands remained uncuffed and that when both hands were cuffed the officers stopped using force. He also relieves Thompson of

any potential liability for his striking of Wilson's face with his hand and the initial knee placed on his back by Underwood. What remains for the reasonable force analysis is Underwood's striking of Wilson in the head several times, Oakley's deployment of the taser twice, as well as his striking Wilson. The Court notes that it is not required to accept Wilson's conclusory statement that the force that Underwood and Oakley used was enough force to kill someone.

When viewing the evidence in a light favorable to Wilson, no reasonable jury could find that the officers' use of force was unreasonable or excessive under the totality of the circumstances. As previously noted, a reasonable officer could have perceived Wilson's admitted eluding as fleeing the scene where an active methamphetamine lab was observed by officers. (Filing No. 34-3 at 18-20.) Wilson was known to law enforcement and was identified in their system as unfriendly to police and someone who carried pepper spray or a knife. (Filing No. 35 at 3.) It was dark on the night in question and Wilson went into an alley, admittedly to evade the officers. (Filing No. 34-3 at 19, 21.) One of Wilson's hands remained uncuffed throughout the time that the officers used force on him. *Id.* at 10. As acknowledged by Wilson, Underwood told him several times to "quit resisting." *Id.*

After the encounter, officers called an ambulance because Wilson had a "small cut that was bleeding…, he was sweating profusely, seemed to have a high heart rate and may have been under the influence of something." (Filing No. 35 at 8.) Although, "an excessive force claim does not require any particular degree of injury," the Seventh Circuit has held it can be a relevant factor in determining whether an officer used excessive force. *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008). Here, the medical evidence confirmed the officer's belief that Wilson was under the influence of something and not acting rational, as he admitted that he tested positive for methamphetamine at the hospital and had a 0.8 alcohol blood level. (Filing No. 34-3 at 16.)

9

Approximately, $644.00 in professional/clinical services was rendered to Wilson, although the billing record does not indicate what was actually performed or what injuries he suffered. ([Filing No. 44-4](#).) The officers' use of force concluded once both of Wilson's hands were placed in handcuffs. *Id.* at 13. These are undisputed facts. The degree of force the officers used in effecting arrest was not deadly force, as a matter of law.

The Court takes as true, Wilson's assertion that Oakley deployed his taser twice[3]. *Id.* at 11. A reasonable officer might make the decision to deploy a taser a second time where it seemed to have no effect in apprehending a resisting suspect wearing thick clothes. Thus, looking at the totality of the circumstances, the officers' reasonable use and degree of force employed in effectuating Wilson's arrest was not excessive. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97.

### 2. Failure to Protect (Count II)

Turning to Wilson's Count II Failure to Protect claim, it fails because, as discussed above, the officers did not commit a Fourth Amendment violation.

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). As discussed extensively above, the officers did not use excessive force against Wilson, thus he did not suffer an underlying constitutional violation. He also does not claim that he was unjustifiably arrested. Wilson's failure to intervene

---

[3] Oakley testified that he deployed the taser once, and ran three to four cycles. ([Filing No. 34-4 at 7](#).)

claim fails as a matter of law because he has not shown that the officers had a reason to intervene against each other's use of force.

### 3. **<u>Qualified Immunity</u>**

Summary judgment in favor of the Defendants on Wilson's excessive force and failure to intervene claims is also appropriate under an alternate ground. The officers are entitled to qualified immunity. Qualified immunity shields public officials from civil liability for acts done in their official capacity, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The issue of qualified immunity is a question of law for the court, not the jury. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether qualified immunity applies, the Court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court also determines "whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* As stated by the United States Supreme Court, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236, (2009).

Wilson cannot meet the second prong of the qualified immunity analysis, even if the Court were to assume a constitutional violation occurred. For the clearly established prong, a plaintiff "must show, on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions

violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). Plaintiffs bear the burden of demonstrating a violation of a clearly established right, and Wilson has not met this burden. *See id.*

Wilson relies on conclusory statements to create genuine issues of material facts in an effort to defeat summary judgment in favor of the Defendants on the basis of qualified immunity. It is true, as stated by Wilson, that it was clearly established, at the time, that excessive force violates the Fourth Amendment. However, Wilson fails to mention the material facts that are particular to his case which dooms his excessive force and failure to intervene claims. He has not produced an analogous case or a violation so clear that officers should have known that their actions violated his constitutional rights. As Wilson admitted, at least initially, he was eluding police by cutting through the alley. Regardless of his reasons for doing so (which were not known to police at the time), a reasonable officer could view his actions as fleeing the scene of what they suspected was an active methamphetamine lab. Further, Wilson does not dispute the officers' information that he was "unfriendly to police" and potentially carried pepper spray or a knife. In fact, he admits that he sometimes carried a pocketknife. Moreover, Wilson does not dispute that the first taser had no effect on him.

Wilson acknowledges that his left hand was uncuffed throughout the forceful encounter, and that once both hands were cuffed the officers ceased using force. Finally, many of the cases that Wilson cites involve the use of *deadly* force on fleeing suspects. See *Estate of Starks v. Enyart*, 5 F.3d 230, 234-235 (7th Cir. 1993) (deadly force used and factual dispute whether officer placed himself in front of vehicle prior to shoot). Here, officers did not use deadly force on Wilson, as a matter of law. Contrary to Wilson's conclusions, the sparse medical evidence he provided from

the night in question, in the form of a bill for services rendered, does nothing to establish the alleged significant injuries he suffered as a result of his encounter with the police.

The Defendants are entitled to qualified immunity because Wilson has failed to establish that the degree of force used by the officers in effectuating his arrest was clearly established as excessive by an analogous case or so clear that it was a violation in light of the circumstances of the particular case at hand. The Court need not address the first prong of the qualified immunity analysis, as Wilson cannot meet the second-prong of the two-part test. Therefore, summary judgment is appropriate on the basis of qualified immunity.

**B.      State Law Claims**

Wilson raises state law claims for assault and battery against Underwood and Oakley in their individual and official capacities, and claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against all Defendants. ([Filing No. 1-3 at 5-7](#).)

      **1.      Assault and Battery (Count III)**

Wilson incorporates by reference his argument related to his Fourth Amendment excessive force claim in asserting Count III for assault and battery. ([Filing No. 45 at 24](#).) As previously noted, the excessive force analysis is examined from the perspective of a reasonable officer on the scene, knowing the facts as they existed at the time, rather than from 20/20 hindsight or facts that subsequently came to light. It is undisputed that the officers' use of force continued while one of Wilson's hands were cuffed, but it also undisputed that the officers stopped using force after both of his hands were cuffed. Wilson's one cuffed hand during the forceful encounter certainly makes this a close case, but combined with the facts that Wilson initially fled or eluded officers at night, into an alley, and was known to be unfriendly to police and to carry a weapon defeats Wilson's

claim for assault and battery. A reasonable officer could conclude that some low-level form of force, though not deadly, was necessary to place Wilson completely in custody and he remained a threat to officer safety so long as he had one hand uncuffed. "Indiana's excessive force standard effectively parallels the federal standard." *Thompson v. City of Indianapolis,* 208 F. Supp. 3d 968, 977 (S.D. Ind. 2016). Based on the analysis above of Wilson's Fourth Amendment claims for excessive force, the Court determines that the Defendants are entitled to summary judgment on Wilson's state law tort claims for assault and battery.

2. **Intentional Infliction of Emotional Distress (Count IV), Negligent Infliction of Emotional Distress (Count V) and Negligence (Count VI).**

The Defendants contend the state law claims in Counts IV, V and VI are barred by the Indiana Tort Claims Act ("ITCA") because the officers were acting within the scope of their employment and under the circumstances of this case, the City is immunized. The ITCA provides substantial immunity for political subdivisions, and its employees, for conduct within the scope of the employee's employment. *Bushong v. Williamson,* 790 N.E.2d 467, 472 (Ind. 2003). "Generally, whether the tortious act of an employee is within the scope of employment is a question of fact. However, under certain circumstances the question may be determined as a matter of law." *Id.* at 473. Employees found acting within the scope of employment is dispositive on any claims under the ITCA. *Id.* at 474. (Indiana Supreme Court holding defendant had immunity under the Indiana Tort Claims Act due to being within the scope of employment despite the plaintiff's allegation that the defendant's acts were criminal). Indiana Code § 34–13–3–3(8) explicitly provides immunity for governmental employees carrying out law enforcement duties, unless the act of enforcement constitutes false arrest or imprisonment. *Johnson ex rel. Indiana Dep't of Child Servs. v. Marion Cty. Coroner's Office,* 971 N.E.2d 151, 156 (Ind. Ct. App. 2012). In *Johnson*, the Indiana Court of Appeals synthesized the "law enforcement immunity" section and Indiana

Supreme Court holdings as, "[t]he Davis court reiterated that 'the critical determination is not whether a governmental entity or employee failed to follow procedures; it is whether a governmental entity or employee failed to enforce a law.'" *Id.* at 158. (quoting *Davis v. Animal Control-City of Evansville,* 948 N.E.2d 1161, 1164 (Ind. 2011).

Wilson has not claimed that he was falsely arrested or imprisoned. Officers pursued Wilson after they saw him leave a residence that they suspected was an active methamphetamine lab. Thus, as a matter of law, the officers' pursuit and arrest of Wilson falls squarely within the "law enforcement immunity" section of the ITCA as the officers were carrying out law enforcement duties within the scope of their employment.

Wilson makes much out of the officers' failure to have their body cameras turned on. It is undisputed that Underwood and Oakley had their body cameras for approximately two months, and that they both testified that they did not think to turn them on in the heat of the moment. Counsel for Wilson asked Oakley if he had wished he had turned the body camera on to which he responded no, because "body cam videos are subject to different perceptions from individuals, so everybody is going to perceive a camera video different from what we did that day." ([Filing No. 44-3 at 8](#).) While this after-the-fact speculation cannot serve to defeat summary judgment, Defendants are reminded that body cameras not only serve to deter police misconduct, but can also be used defensively where excessive force has been alleged. Body camera footage certainly would have helped the Court in the case at bar quickly reduce, if not eliminate, many non-genuine factual disputes at issue.

Indiana courts have recognized that ITCA grants immunity to police officers for negligent and intentional torts committed while effecting an arrest, unless the officers' conduct is so egregious to be considered outside the scope of their employment. *Jordan v. City of Indianapolis,*

15

No. IP 01-1391-C H/K, 2002 WL 32067277, at *11 (S.D. Ind. Dec. 19, 2002) (*see also City of Anderson v. Weatherford,* 714 N.E.2d 181, 186 (Ind. Ct. App. 1999)). The facts of this case, considered in the light most favorable to Wilson, do not show conduct so egregious to be considered outside the scope of their employment. Accordingly, all state law claims under the ITCA against Underwood and Oakley fail and summary judgment is **granted** in their favor.

The claims against Underwood and Oakley in their official capacities, and the City, fail, as a matter of law, because the case at hand falls squarely within the "law enforcement immunity" section of the ITCA. Summary judgment is **granted** in favor of all Defendants on all remaining state law claims (negligence and intentional and negligent infliction of emotional distress).

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Filing No. 34) is **GRANTED.** Summary judgment is granted to each of the Defendants on all claims asserted by Wilson. The Court will issue Final Judgment under separate order.

**SO ORDERED.**

Date: 2/7/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brooke Smith
KEFFER BARNHART LLP
smith@kbindy.com

Scott Leroy Barnhart
ATTORNEY AT LAW
barnhart@kbindy.com

Clifford R. Whitehead
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
cwhitehead@zsws.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com